IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARK S. SILVER, :
    Plaintiff, :
: CIVIL ACTION
v. :
:
PHILADELPHIA GAS WORKS, : NO. 11-cv-7898
    Defendant. :

MEMORANDUM ORDER

AND NOW, this 28th day of November 2012, upon consideration of Plaintiff's Motion for Summary Judgment (Doc. No. 13), Defendant's opposition thereto (Doc. No. 25), Defendant's Motion for Summary Judgment (Doc. No. 14), and Plaintiff's opposition thereto (Doc. No. 23), it is hereby ORDERED that Plaintiff's Motion (Doc. No. 13) is DENIED and Defendant's Motion (Doc. No. 14) is GRANTED. The Clerk of Court is directed to close this case for statistical purposes.

I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Mark Silver ("Plaintiff" or "Silver") began working for Defendant Philadelphia Gas Works ("Defendant" or "PGW") in 2001 as a telephone customer service representative. (Doc. No 13, Ex. A, at 12-13). Throughout his career at PGW, Plaintiff committed multiple violations of corporate policy, resulting predominantly from mistreatment of customers and unapproved absences. PGW terminated Plaintiff in August 2011, which Plaintiff alleges constitutes unlawful discrimination and retaliation in violation of the American with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA"), the Family Medical Leave Act, as

1

amended, 29 U.S.C. § 2601 et seq. ("FMLA"), the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. ("FLSA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA").

Plaintiff's reoccurrence of disciplinary issues at PGW started on March 17, 2008, when Plaintiff, a telephone service representative, refused to transfer a customer's call to a supervisor despite the customer's twelve requests. (See Doc. No. 16, at Ex. K). On April 14, 2008, PGW held a disciplinary hearing regarding the incident with Plaintiff and his union representatives present. After listening to a taped recording of the phone conversation at the hearing, Plaintiff's supervisor, Steve Jordon, described Plaintiff's tone as "condescending." PGW informed Plaintiff that his mistreatment of the customer violated the Corporate Discipline Policy.[1] In lieu of termination, PGW suspended Plaintiff for ten days without the right to grieve the suspension. (Id.).

Less than one month after the first incident, Plaintiff re-violated PGW's Corporate Discipline Policy when he mistreated another customer on the telephone. Upon listening to the recording, Jordon described Plaintiff's interaction with the customer as "smug and condescending" and inappropriate behavior from a customer service representative. (Id., at Ex. J). On May 1, 2008, which was Plaintiff's first day back after serving his ten day suspension, PGW held a disciplinary hearing regarding Plaintiff's second customer-mistreatment incident. Plaintiff and his union representatives were present at the hearing. As a result of the incident, Plaintiff received another ten day suspension. Thereafter, Plaintiff filed an internal complaint

---

[1] Section IV of PGW's Corporate Discipline Policy, Major Work Rule Violations Subject to Progressive Discipline, lists among the offenses: "Improper and/or unprofessional treatment of customers." (Doc. No. 16, Ex. L).

2

with PGW, alleging that his supervisor, Mr. Jordon, discriminated against him based on his race, color, religion, disability and the exercise of his FMLA rights.[2] (See Doc. No. 13, Ex. G). PGW investigated the allegations and concluded they were unfounded. (See id., at Ex. J).

On October 1, 2008, Plaintiff's disciplinary issues continued when he missed work without providing a certified doctor's note. Pursuant to PGW's absence policy, employees who exhaust their annual FMLA entitlement and paid sick days are subject to termination if they do not submit a certified doctor's note on the day they return to work. (See Doc. No. 16, Ex. G). In 2003, Plaintiff had received intermittent FMLA leave for health conditions related to anxiety. Believing Plaintiff had exhausted all of his FMLA leave prior to missing work on October 1, 2008, PGW fired Plaintiff for violation of its absence policy. Following a grievance filed by Plaintiff through his union, PGW later determined that Plaintiff had not actually exhausted his FMLA leave, and thus never violated the absence policy. On February 19, 2009, PGW rehired Plaintiff with full seniority and backpay. (Doc. No. 15, at ¶ 55; Doc. No. 24, at ¶ 55; Doc. No. 16, Ex. LL). PGW also compensated Plaintiff for lost overtime. (Doc. No. 15, at ¶ 56; Doc. No. 24, at ¶ 56; Doc. No. 16, Ex. KK).

On April 29, 2009, PGW fired Plaintiff for a second time after he refused to provide a urine sample for a drug test in violation of PGW's drug and alcohol policy. (Doc. No. 15, at ¶ 58; Doc. No. 16, at ¶ 58; Doc. No. 16, Ex. CC, at 22 ¶ J; Doc. No 18, at 138). Plaintiff was subject to the drug test in 2009 because he had failed a prior, random drug test in January 2007. (Doc. No. 18, Ex. 3, at 27). Plaintiff provided a sufficient amount of urine for the test in January

---

[2] In 2003, Plaintiff applied for and received intermittent leave pursuant to the FMLA for health conditions related to anxiety.

2007.  (Id., at 31).  On May 13, 2009, Plaintiff was reinstated with backpay when PGW determined that Plaintiff's inability to provide a sufficient urine sample was caused by a medical condition known as paruresis (commonly referred to as a "shy bladder").  (Doc. No. 16, at ¶ 63; Doc. No. 24, at ¶ 63; Doc. No. 18, at 97).  According to PGW, Plaintiff provided no indication that he suffered from paruresis prior to the drug test.

When Plaintiff returned from his suspension he filed another internal complaint alleging hostile work environment and retaliation.  (Doc. No. 13, at 6).  After an investigation, PGW concluded the complaint was unsubstantiated.  (See Doc. No. 13, Ex. R, S).  Nonetheless, on May 1, 2010, PGW transferred Plaintiff from customer service to the supply chain department, where Jordon was no longer his supervisor.  (Doc. No. 15, at ¶ 69; Doc. No. 24, at ¶ 70).

After being transferred to his new department, Plaintiff developed issues with getting to work on time.  Steven Kernaghan, Plaintiff's new supervisor, he offered to help Plaintiff become more punctual.  Kernaghan provided his phone number to Plaintiff so he could call if running late, offered to give Plaintiff "wake-up calls" in the morning, and even offered to change Plaintiff's working hours.  (See Doc. No. 18, Ex. 8, at 8-9).  Plaintiff never afforded himself of these opportunities, and by February 2011, his frequent tardiness became what PGW considered a "lateness problem."  (See Doc. No. 14, at 10).

On February 9, 2011, PGW held a hearing in the presence of Plaintiff and his union representative regarding his fourth lateness within a rolling twelve month period.  (See Doc. No. 16, at Ex. MM).  At the hearing, PGW discussed its lateness policy and reiterated to Plaintiff that he must "make every effort to report to work on time the days he is scheduled."  (Id.).  A few weeks after the hearing, Plaintiff requested and received intermittent FMLA to care for his father.

4

(Doc. No 15, at ¶ 73; Doc. No. 24 at ¶ 73).

By June 3, 2011, Plaintiff had exhausted all of his paid sick leave he had earned during his ten years of employment. In the presence of Plaintiff's union representatives, PGW informed Plaintiff that because he had exhausted his paid sick leave, any future absence may result in disciplinary action. (Doc. No. 15, at ¶ 74; Doc. No. 24, at ¶ 74; Doc. No. 13, Ex. HH). On June 23, 2011, Plaintiff filed another internal complaint, alleging disability discrimination, FMLA retaliation and FLSA issues.[3] (Doc. No. 13, at 7). PGW investigated the complaint and once again determined the allegations were unfounded. (Doc. No. 13, Ex. V).

On July 21, 2011, Plaintiff received a six day suspension for "failing to call out sick/late before his starting time." (Doc. No. 13, Ex. 37; Doc. No. 15, at ¶ 75; Doc. No. 24, at ¶ 75). Pursuant to the suspension, Plaintiff was ordered to return to work on August 1, 2011. Plaintiff informed PGW that he had a custody hearing for his daughter on August 1, 2011, and requested to be excused from work that day. (Doc. No. 13, Ex. 37; Doc. No. 16, Ex. FF; Doc. No. 24, Ex. D). PGW explained that because Plaintiff had used all of his paid leave, he would have to provide documentation from the court before PGW determined whether his absence would be permissible. (Doc. No. 13, Ex. 37).

On July 28, 2011, Plaintiff sent PGW Manager, Francisco Adams, copies of what purported to be an "Order of Court" for Plaintiff to appear at Family Court of Philadelphia on August 1, 2011. (Doc. No. 15, at ¶ 79-80; Doc. No. 16, Ex. DD; Doc. No. 24, at ¶ 79-80, Ex. D).

---

[3] The FLSA allegations stemmed from internal complaints filed by Plaintiff in early 2011. Plaintiff complained that PGW had failed to pay him wages dating back to his transfer in May 2010. (Doc. No. 13, at 7). PGW investigated the allegations and ultimately provided Plaintiff full compensation for the unpaid wages.

5

The undated and unsigned "Order of Court" provides no indication that it was issued by either a judge or an attorney. (See Doc. No. 16, Ex. DD, EE).

After receiving a copy of the order, Adams attempted to contact Plaintiff several times to discuss the request. Adams left Plaintiff a voicemail message, asking him to be available on July 29, 2011, at 9:00 a.m. for a conference call to resolve the matter. On July 29, 2011, at 9:20 a.m., Adams had still not heard from Plaintiff. In the presence of Plaintiff's union representative, Adams left Plaintiff a final voicemail message, informing him that pursuant to PGW policy, employees are typically not granted more than one personal day per year. Adams explained that because Plaintiff had already taken a personal day on February 4, 2011, PGW would be denying his request to take leave on August 1, 2011.[4] Plaintiff was told he must therefore report to work at 7:00 a.m. on Monday, August 1, 2011, or otherwise be subject to discipline. Within the hour, Adams finally spoke to Plaintiff on the telephone and reiterated the content of his voicemail message. (See Doc. No. 16, at ¶¶ 79-83, Ex. FF; Doc. No. 15, at ¶¶ 79-83).

On Monday, August 1, 2011, Plaintiff reported to work at 6:55 a.m. Around 9:30 a.m., Plaintiff told Adams that he was not feeling well and went to PGW's medical department for treatment. At 9:42 a.m., Plaintiff delivered Adams a note from the PGW medical department, indicating that he was being sent home due to illness. (Doc. No. 16, at ¶¶ 88-90; Doc. No. 15, at ¶ 88-90). Plaintiff informed the medical department that he had scheduled an appointment with his personal physician for 11:45 a.m. (Doc. No. 16 , Ex. T). Prior to leaving work, Plaintiff

---

[4] Pursuant to PGW's "Witness Verification" policy, PGW provides paid leave "for all employees subpoenaed to appear as Government witnesses in criminal or civil cases in local jurisdictions." (Doc. No. 16, Ex. Z). The policy, however, does not extend to "employees subpoenaed to appear as witnesses in civil cases not on behalf of any governmental agency." (Id.). Plaintiff does not contend that his order to appear in Family Court falls within the Witness Verification policy.

stopped by the Human Resources office and obtained FMLA paperwork for himself. (Doc. No. 13, Ex. 30).

On August 1, 2011, Adams informed PGW's Labor Unit that Plaintiff left sick for the day. Suspicious of Plaintiff's reason for leaving work, PGW's Director of Labor, Joffie C. Pittman, decided to conduct outside surveillance. Around 10:00 a.m., Pittman contacted PGW's Director of Security, John Ferrer, and explained that he suspected Plaintiff may be headed to a hearing at Family Court in Philadelphia instead of going home. (Doc. No. 18, Ex. 5, Ex. 15). Ferrer directed two PGW security officers, John Marcolongo and Alex Breyer, to go to Family Court in Philadelphia to see if Plaintiff was there.

The guards arrived at the courthouse around 11:00 a.m. with a photograph of Plaintiff and a description of the clothing he wore to work that day. Marcolongo waited outside the building while Breyer parked the vehicle less than one block away. Marcolongo testified that around 11:30 a.m., Plaintiff exited the building with a young female. Marcolongo approached Plaintiff and asked if he could talk to him alone for a minute. Marcolongo asked Plaintiff whether anyone knew he was in court, or whether he told anyone he would be in court that day. Plaintiff responded "no" to both inquiries. According to Marcolongo, Plaintiff soon became agitated and told Marcolongo, "I don't appreciate you coming down here while I am at court over a case" involving payment. (Doc. No. 18, Ex. 10, at 30-31). Breyer testified that he witnessed the confrontation take place from his parked vehicle. (See Doc. No. 18, Ex. 4, at 29-42).

The guards returned to PGW around 11:45 a.m. on August 1, 2011. Marcolongo reported the details of his encounter to Ferrer. Later that day, Ferrer met with Pittman, John Rooney

7

(Manager of Labor Relations), and William Muntzer (Vice President of Human Resources), and briefed them on the information he received from Marcolongo. (Doc. No. 18, Ex. 14, at 177).

On August 3, 2011, Plaintiff participated in a disciplinary hearing regarding the Family Court incident. At the hearing, Plaintiff denied that he ever attended Family Court on August 1, 2011. (Doc. No. 13, Ex. 37). He alleged that he did not go to the hearing because his attorney informed him on July 29, 2011, that the hearing had been cancelled. Earlier in the hearing, however, Plaintiff exclaimed that he "was going to go down to the hearing no matter what." Id.

Rather than attend the hearing, Plaintiff alleged that after he left work on August 1, 2011, he went directly home and then to his doctor's appointment. To support his allegation, Plaintiff submitted what was purported to be a doctor's note from August 1, 2011. The note, however, did not indicate his time of treatment and did not bear a physician's signature.[5] (Doc. No. 13, Ex. 36). By letter dated August 4, 2011, PGW terminated Plaintiff for "sick fraud" and refusal to work in violation of its Corporate Discipline Policy. (Doc. No. 13, Ex. 37).

On December 29, 2011, Plaintiff brought this civil suit against PGW, seeking recompense for his termination on August 4, 2011. Plaintiff's complaint asserts that PGW's termination constitutes unlawful discrimination and retaliation in violation of the ADA, FMLA, FLSA, and PHRA. Both parties move for summary judgment.

---

[5] It was later verified that the note was authentic, and Plaintiff had a doctor's appointment scheduled for 11:45 on August 1, 2011. However, the evidence, which includes a sign-in sheet from the doctor's office, provides no indication that Plaintiff was present for his appointment at that time. (See Doc. No. 16, Ex. E; Doc. No 23, Ex. B).

II.     LEGAL ANALYSIS

A.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), we must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Accordingly, the nonmoving party cannot avoid summary judgment "merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Where, as here, the parties file cross-motions for summary judgment, the Court "construes facts and draws inferences in favor of the party against whom the motion under consideration is made." Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir. 2008) (quotation omitted).

B.      Plaintiff's Discrimination and Retaliation Claims

The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) governs Plaintiff's discrimination and retaliation claims alleged under the ADA,[6]

---

[6] We recognize that retaliation and discrimination are separate claims under the ADA, each requiring different prima facie elements. However, both claims follow the McDonnell Douglas framework. In this case, we assume Plaintiff met his prima facie burden for his retaliation and discrimination claims under the ADA. Therefore, we need not engage in a separate analysis for each ADA claim.

9

PHRA, FMLA, and FLSA. See, e.g., Lichtenstein v. Univ. of Pittsburgh, 691 F.3d 294, 302 (3d Cir. 2012) (applying McDonnell Douglas to FMLA discrimination/retaliation claim); Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 759, n.3 (2004) (applying McDonnell Douglas to ADA retaliation claim); Cononie v. Allegheny Gen. Hosp., 29 Fed. Appx. 94 (3d Cir. 2002) (applying McDonnell Douglas to FLSA discrimination/retaliation claim); (Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (applying McDonnell Douglas to ADA discrimination claim); Jones v. School District of Philadelphia, 198 F.3d 403 (1999) (applying McDonnell Douglas to PHRA discrimination claim).

The McDonnell Douglas burden-shifting framework involves three steps. First, the plaintiff must prove a prima facie case of discrimination or retaliation. Second, if plaintiff satisfies his burden of persuasion, the employer bears the burden to produce any legitimate, nondiscriminatory reason for the adverse employment action. Third, if the employer meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was merely pretext for discrimination. McDonnell Douglas, 411 U.S. at 802.

For purposes of resolving these motions only, we assume that Plaintiff satisfied his prima facie burden. Therefore, the first issue to resolve is whether PGW has satisfied its burden of production. "'The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'" Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)). Satisfying the second prong is a "relatively light burden." Fuentes, 32 F.3d at 763.

Here, PGW terminated Plaintiff because he engaged in sick fraud and refused to work in

10

violation of PGW's corporate policy. PGW expressly told Plaintiff that he could not miss work to attend his court hearing. On the day after he served his suspension for abusing PGW's absence policy, Plaintiff reported to work for slightly over two hours before complaining that he felt ill and had to go home. However, Plaintiff did not go home or to his physician's. He attended Family Court. Thus, not only did Plaintiff misrepresent the seriousness of his illness, he deliberately violated PGW's instruction to not miss work for the court hearing. Accordingly, Defendant satisfies its burden of production to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff on August 1, 2011.

Because PGW met its burden, Plaintiff must prove that PGW's proffered reason for termination was merely pretext for discrimination or retaliation. To prove pretext at the summary judgment stage, Plaintiff must either: (1) "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the [employer's] proffered reasons for [the adverse employment decision]" or (2) provide "sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." Fuentes, 32 F.3d at 765. Here, Plaintiff has failed to raise a material issue of fact on either ground.

To discredit PGW's termination decision, Plaintiff argues that he never attended family court on August 1, 2011, and the note from his doctor proves he was in fact sick that day. Even if we accept Plaintiff's allegation as true, it proves only that PGW's termination decision may have been based on incorrect or mistaken information. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or

mistaken." Fuentes, 32 F.3d at 765. The plaintiff must demonstrate "weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." Id. Plaintiff fails to show that PGW's decision to fire him for sickness fraud was based on weak or implausible evidence. To the contrary, the decision was based on a factually detailed report provided by PGW's security department. According to the report, Plaintiff blatantly disregarded his department's instruction and expressly violated company policy for sick fraud and refusal to work. Based on that information, no rational factfinder would find PGW's reason for termination "unworthy of credence." See id. (citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992).

Plaintiff also argues that his termination was motivated by illegitimate factors, such as discrimination and retaliation. One way to prove that an employer's adverse employment decision was motivated by illegitimate factors is to show that "the employer in the past had subjected him to unlawful discriminatory treatment." Fuentes, 32 F.3d at 765. Plaintiff contends that his blemished record consisting of multiple terminations and disciplinary issues with PGW reflects an "established pattern of discrimination and retaliation." (Doc. No. 23, at 19). There is no evidence, however, that PGW's disciplinary measures taken against Plaintiff derive from discrimination or retaliation. Rather, they stem directly from Plaintiff's own infractions, which include a pattern of mistreating customers, repeated tardiness, and unapproved absences. Plaintiff simply does not provide evidence from which a factfinder could reasonably conclude that discrimination or retaliation was more likely than not the motivating cause for his termination.

In sum, Plaintiff fails to prove that PGW's decision to terminate him for "sick fraud" and

refusal to work in violation of corporate policy was merely pretext for discrimination or retaliation. Because Plaintiff cannot satisfy his burden under the McDonnell Douglas framework, we must deny his discrimination and retaliation claims.

III.   CONCLUSION

For the aforementioned reasons, we GRANT Defendant's Motion for Summary Judgment (Doc. No. 14) and DENY Plaintiff's Motion for Summary Judgment (Doc. No. 13). The Clerk of Court is directed to close this case for statistical purposes.


BY THE COURT:

/s/ Legorme D. Davis

Legrome D. Davis, J.